# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

PAUL GUNDERSON,

            Plaintiff,

v.

BNSF RAILWAY COMPANY,

            Defendant.

Case No. 14-CV-0223 (PJS/HB)

ORDER

---

Michael P. McReynolds, TELLO LAW FIRM; and Fredric A. Bremseth and Christopher J. Moreland, BREMSETH LAW FIRM, PC, for plaintiff.

Joanne R. Bush and Jacqueline M. Holmes, JONES DAY; and Lee A. Miller and Sally J. Ferguson, ARTHUR, CHAPMAN, KETTERING, SMETAK & PIKALA, PA, for defendant.

Plaintiff Paul Gunderson brought this lawsuit against his former employer, defendant BNSF Railway Company ("BNSF"), alleging that BNSF violated the anti-retaliation provisions of the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109, when it fired him after he had engaged in protected activity. This matter is before the Court on BNSF's motion for summary judgment. Because no reasonable jury could find that BNSF's decision to fire Gunderson was motivated by hostility to his protected activity, the Court grants BNSF's motion and dismisses Gunderson's complaint.

1

BACKGROUND[1]

*A. Gunderson's Protected Activity*

Gunderson worked at BNSF's yard in Willmar, Minnesota, from October 1989 until he was fired in August 2009. *See* ECF Nos. 48-1 at 14; 48-21; & 48-24. Over the course of his career, Gunderson worked as a brakeman, conductor, switchman, and remote-control operator. ECF No. 48-1 at 17. Gunderson was also actively involved in the United Transportation Union ("UTU"), serving as the local union officer (or "local chairman") and as the vice general chairman for the International Union. *Id.* at 15-16. Two aspects of Gunderson's history at BNSF are particularly important to this case: First, Gunderson was an outspoken safety advocate. Second, Gunderson suffered and reported a work-related injury in 2008.

As to the safety advocacy: Gunderson was known as a "bulldog" for safety, ECF No. 52-1 at 13, and he was one of the "highest profile safety advocates in the Willmar area," *id.* at 63-64. He raised numerous safety concerns over a span of eight or nine years while he worked in the yard. ECF No. 48-1 at 17-21, 31-38 (Gunderson yearly

_____

[1]The facts described in this order are undisputed or represent Gunderson's version of disputed facts. The Court notes that the record is unusually robust. This case has been litigated for almost six years—first within BNSF, then before a panel of arbitrators, then in administrative proceedings, and finally before this Court. During the administrative proceedings, an administrative law judge conducted a six-day evidentiary hearing, and the testimony and evidence received at that hearing have been made part of the record in this case.

raised complaints about dust, weeds, lighting, and snow, among other topics).

Gunderson's most recent safety complaint was in March 2008. *See id.* at 41. At that

time, Gunderson reported BNSF to the Federal Railroad Administration ("FRA") for not

performing required air tests on certain trains. *Id.* at 17-19. When the FRA determined

that BNSF had violated the air-test rule, terminal manager Herb Beam complained,

"Gunny, you just threw [a] whole fucking wrench into my yard." *Id.* at 18. Beam "was

upset about the repeated complaints about safety and other matters" and lamented that

his "job would be a lot easier if Gunderson . . . [wasn't] around." ECF No. 52-1 at 65

(affidavit of William Fry, former superintendent of operations at Willmar).

As to Gunderson's injury: In September 2008, Gunderson injured his right

shoulder in the course of performing his duties for BNSF. ECF No. 48-1 at 25. Beam

and Michael Babik, the superintendent of operations, insisted that Gunderson report his

injury. *Id.* at 38; ECF No. 48-26 at 4. Gunderson reported his injury the following day.

*See* ECF Nos. 48-1 at 25-27 & 52-1 at 71.

At the time, reporting an injury could have negative consequences for both the

employee and management. First, employees who were enrolled in BNSF's "Employee

Review Process" ("ERP") accumulated points when they were injured at work—

40 points for reportable (i.e., serious) injuries and 5 points for non-reportable (i.e.,

minor) injuries. ECF No. 52-1 at 26. The more points employees accumulated, the more

BNSF monitored and tested them.  *Id.* at 27.  Gunderson, however, was *not* enrolled in

the ERP program.  ECF No. 54-1 at 55.  Second, BNSF officers' bonuses were affected by

the number of reported injuries.  Gunderson submitted evidence that bonuses were tied

to "the total number of injuries and reportable injuries in *each manager's territory*."  ECF

No. 52-1 at 66 (emphasis added).  But BNSF officers testified that bonuses were instead

tied to the total number of injuries reported *nationwide*, across the entire company.  ECF

No. 54-1 at 49, 53-54.  In any event, the record contains evidence that "BNSF did not

want personal injuries reported" and that Babik in particular "was mad about the

injuries that . . . Gunderson reported."  ECF No. 52-1 at 65-66.

### B.  BNSF's Disciplinary Procedure

When BNSF seeks to discipline an employee for violating a company rule, BNSF

issues a notice of investigation to the employee.  ECF No. 48-1 at 72-73.  The notice

informs the employee of the charges against him and describes the rights that the

employee has in the disciplinary process, such as the right to be represented by the

union.  BNSF then conducts a formal investigation.  *Id.* at 73.  The investigation takes

the form of an adversarial hearing at which BNSF must prove by "substantial evidence"

that the charges against the employee are true.  *Id.* at 73-74.  The parties—that is, BNSF

(typically represented by a BNSF officer) and the employee (typically represented by

the union)—present evidence, examine and cross-examine witnesses, and make closing

arguments.  A BNSF officer presides over the hearing.  A transcript of the hearing is made and sent to still other BNSF officers, and those officers decide whether and how the employee should be disciplined.  *See id.* at 73.  The employee is notified in writing of their decision.

*C. Gunderson's First Alleged Violation*

The events leading up to Gunderson's dismissal began with the alleged misconduct of another BNSF employee—David Peterson.  In March 2009, two BNSF employees and union members—Mitchel Duke and Robert Cluka—made formal complaints to their supervisor that Peterson had used a company computer to gain access to their private information, printed out that information, and left that information in a common area, where any employee could see it.  *See* ECF Nos. 48-5 & 48-6.  BNSF issued a notice of investigation to Peterson, informing him that a hearing (or "investigation") would take place in a week.  ECF No. 48-6.  The notice identified Duke and Cluka as witnesses who would testify against Peterson at that hearing.  *Id.* Gunderson learned about the notice of investigation and told Babik that he might represent Peterson at the hearing.  Babik responded, "I told you to stay away from this . . . if you get involved you could be next [to be fired]."  ECF No. 52-1 at 31.

On May 28, 2009, Duke and Cluka informed their local union president, Doug Campen, that Gunderson and another union member, Steve Mace, had pressured them

to retract their statements against Peterson. ECF No. 48-9 at 4. Campen immediately reported this information to Babik, who immediately contacted his superior—Richard Ebel, the Twin Cities division general manager. *See* ECF Nos. 48-8 & 48-1 at 115-16. Ebel requested (and later received) written statements from Duke, Cluka, and Campen about the pressure applied by Gunderson and Mace. ECF Nos. 48-1 at 116; 48-10 at 3-4 (Duke statement), 5-6 (Cluka statement); & 48-9 at 4-5 (Campen statement).

In Duke's written statement, Duke recounted that Gunderson had approached him on multiple occasions over the course of approximately two months. *See* ECF No. 48-10 at 3-4. First, on April 11, 2009, Gunderson approached and "harassed" Duke at work and "told [him] to withdraw [his] statement and complaint about Dave Peterson and if [he] did not, things could get really bad . . . and the company could turn on [him] and [he] could get fired." *Id.* at 3. Second, on May 21, after Duke injured his ankle at work, Gunderson "told [him] that if [he] played [his] cards right that [his] ankle would be worth a 500,000 dollar lawsuit against BNSF Railway."[2] *Id.* Finally, on May 29, Duke went to Gunderson's house (on the advice of Campen) to pick up a recantation letter that had been drafted by Peterson's attorney (Michael Tello) and sent to Gunderson for him to review. *Id.* at 3-4. Gunderson told Duke that "by signing this

---

[2]Duke initially thought this statement was "kind of ridiculous," but later, after documenting his interactions with Gunderson, interpreted this statement to be part of the scheme to convince him to recant. ECF No. 48-13 at 18-19.

letter, [Duke] would be 100% out of the picture and there would be no reprecautions [sic] by BNSF Railway." *Id.* at 4. Duke further stated: "I am concerned for my safety at work, I'm afraid there will be retaliation by other union members and Gunderson . . . will try and do something to make my life harder . . . ." *Id.*

In Cluka's written statement, Cluka reported that in mid-April, he saw Mace in a grocery store and started a conversation with him. *Id.* at 5. After talking about what to expect during a typical investigation, Mace asked Cluka if he "would be willing to change [his] mind and stop the process of the current investigation on Dave Peterson . . . ." *Id.* Mace told Cluka that "his only concern was he would not like to see someone loose [sic] there [sic] job." *Id.* Cluka would not change his mind. *Id.* Mace then "said that he understood, and he never brought it up again . . . ." *Id.* Cluka stated that this encounter "was the last time [Cluka] . . . had a conversation with any of the UTU reps at Willmar MN on this matter." *Id.* Cluka stated that he no longer felt like he was part of the Willmar yard; instead, he now had to "question every look, and every gesture . . . ." *Id.* at 5-6. He found himself "thinking about the safety of [his] family and pets, [his] property . . . ." *Id.* at 6; *see also* ECF No. 48-9 at 5 (Campen stated that he felt that Duke and Cluka "will most likely continue to be severly [sic] harassed at work.").

After receiving the written statements from Duke, Cluka, and Campen, Ebel decided to issue a notice of investigation to Gunderson. ECF No. 48-1 at 94. Ebel

considered "harassment and intimidation in the workplace" to be a "very serious rules violation." *Id.* at 92. Before issuing the notice, Ebel consulted personnel in BNSF's labor-relations department—specifically James Hurlburt and Milton Siegele. *Id.* Hurlburt was an attorney who worked in Fort Worth, Texas; he had never heard of Gunderson or his prior safety advocacy. *Id.* at 76. Both Hurlburt and Siegele agreed that Ebel should issue the notice to Gunderson. *Id.* at 77, 92. Ebel decided to remove Gunderson from service pending the outcome of the investigation. *Id.* at 99.

### D. BNSF Prepares First Notice of Investigation

Over the next few days, BNSF officers worked on drafting the notice of investigation that would be issued to Gunderson. *See* ECF Nos. 48-38 (June 1-3, 2009 email chain discussing the wording of the notice and the deadlines for serving notice and holding the investigation hearing) & 54-4 (June 3, 2009 email chain discussing further changes to the language in the notice). They also discussed what to do about Mace. Some officers questioned whether Mace should be withheld from service, and others discussed how Mace might be used to BNSF's advantage. *See* ECF No. 48-38 (emails among BNSF officers). Everett Percival (the director of administration) suggested that "Mace may want to turn state's evidence for a Level 'S' 30 day Record and implicate Gunderson. We above all want Gunderson." *Id.* at 3; *see also* ECF No. 54-1 at 44, 50-51 (Ebel explaining that Percival made the comment because "the

allegations against Mr. Gunderson were much more severe than those against

Mr. Mace" and "[t]he harassment and intimidation . . . were dramatically different.").

On June 2, 2009, a day before the notice was finished, Gunderson called Beam

and Ebel because Gunderson had heard about an "inappropriate interaction at

Willmar." ECF No. 52-1 at 102 (email exchange between Ebel and Beam relaying

conversations that each had with Gunderson). Neither Beam nor Ebel told Gunderson

that he was about to be served with a notice of investigation. *Id.* Beam told Gunderson

that "to the best of [his] knowledge there had been no altercation in Willmar today." *Id.*

Ebel "told him there was nothing new in Willmar." *Id.*

Also during this time, Beam and Ebel were beefing up security in Willmar in

anticipation of the disciplinary proceedings against Gunderson. On June 1, Beam held a

meeting to discuss camera coverage of the BNSF parking lots, increased police presence

near the witnesses' homes, and inviting BNSF security guards (known as "resource

protection" personnel) to be present when Beam handed the notice of investigation to

Gunderson. *See* ECF No. 48-15. Beam stated that he contacted resource protection

"[b]ecause we wanted to have someone there in case the situation started to get out of

hand. There were a lot of things going on in the terminal at Willmar at that point in

time." ECF No. 48-1 at 53-54. Ebel had on previous occasions asked resource protection

to be present when an employee was going to be immediately removed from service

pending the outcome of the investigation—as was the plan with respect to Gunderson. *Id.* at 100.

### E. Gunderson's Second Alleged Violation

The notice of investigation was finalized on June 3, 2009, less than 45 minutes before Gunderson was scheduled to report for work. *See* ECF No. 54-4. After Gunderson arrived, he was sent to Beam's office, and Beam handed him the notice. Two resource-protection officers from Minneapolis—Scott Poundstone and Eric Collins—were stationed about ten feet away from Beam's office, across and down the hallway. ECF No. 48-1 at 54, 58-59. After Beam gave Gunderson the notice, Beam told Gunderson that "as [Gunderson] was a local chairman, . . . he was familiar with the process of being removed from service and . . . he would need to leave the property promptly." *Id.* at 58. As Beam and Gunderson moved toward the door of Beam's office, Gunderson said, "Herb, you know I'm not just a local chairman." *Id.* Beam replied, "Yes, I understand that, Paul." *Id.* As they were going out the door, Gunderson said, "Herb, you know, sometimes things can come back to hurt you." *Id.* Beam then walked Gunderson out of the building, and Gunderson left the property. *Id.* at 59-60.

Beam interpreted Gunderson's last statement as a threat. Beam testified, ". . . I could tell by the tone of his voice, by the inflection in his voice, by the body language and by the very nature of the words that he chose that, you know, it was a threat." *Id.* at 59. The two resource-protection officers (Poundstone and Collins) also

10

heard Gunderson's statement.  *See* ECF Nos. 48-17 at 4-5 (Poundstone's and Collins's incident reports) & 48-1 at 66-67 (Poundstone testimony).  They, too, interpreted the statement as a threat.  ECF No. 48-23 at 7, 9.  Poundstone testified that he had never heard of Gunderson, Gunderson's safety advocacy, or Gunderson's injury report.  ECF No. 48-1 at 64-65.  (The record does not contain any evidence about whether Collins was aware of Gunderson's protected activity, but, given that Collins was a security guard stationed in Minneapolis—which is roughly 100 miles from Willmar—it seems unlikely.)

Beam immediately reported Gunderson's statement to Ebel.  ECF Nos. 48-16 at 2 & 48-18.  Beam was required by company policy to report all threats, ECF Nos. 48-1 at 60 & 54-1 at 15, and Poundstone encouraged Beam to follow the policy and report Gunderson's threat, ECF No. 52-1 at 49.  After receiving Beam's report, Ebel asked the advice of BNSF labor-relations personnel about whether Gunderson's alleged threat was "worthy of additional pursuit as secondary investigation."  ECF No. 48-18 at 3. Those labor-relations personnel advised Ebel that a second notice should issue.  *See id.* at 2-3; ECF No. 48-19 (second notice of investigation issued on June 9, 2009).  Ebel considered the alleged threat to be "a serious rules violation, a violation of company policy that says we will not intimidate, harass, or threaten coworkers in the workspace." ECF No. 48-1 at 104.

Although Gunderson was personally served with the first notice of investigation, Mace was served with his notice of investigation by certified mail—despite the fact that he, like Gunderson, was to be removed from service.  ECF No. 54-1 at 25.  BNSF said that it served Mace by certified mail because Mace was on vacation.  BNSF also called Mace, told him not to come onto the property, and warned him of the notice in the mail because it "did not want his family to open the notice.  We wanted Steve to be the first one to know."  *Id.* at 24-25.

According to BNSF officers, notices of investigation are usually served by certified mail, unless the employee is going to be removed from service.  ECF No. 54-1 at 16.  Gunderson, however, testified that notices are "always" served by mail and "[n]ot once in nineteen-and-a-half years ha[d] [he] ever seen an investigation notice served in person in Willmar."  ECF No. 52-1 at 35.  Beam testified that he had previously served notices of investigation in person.  ECF No. 54-1 at 14.  Poundstone also testified that he had been present for in-person service of notices, though rarely.  ECF No. 52-1 at 50.

### F.  Investigation Hearings and Dismissal

To prepare for the formal investigation hearings, Hurlburt sent out a witness outline prefaced with "[t]wo key items to establish":  (1) that "Gunderson harassed/intimidated/bribed Duke;" and (2) that "our witnesses offer nothing to indicate Gunderson was acting as a [union local chairman] in his interactions with

Duke." ECF No. 52-1 at 105. Hurlburt explained that the investigation hearings are adversarial, pitting BNSF against the accused employee. ECF No. 54-1 at 28. Hurlburt testified that it was not unusual for him to assist in preparing the case, especially when the case was as complex as Gunderson's, because Hurlburt was a lawyer and the BNSF officers who acted as "prosecutors" at the hearings were not. *Id.* at 28-29, 33, 39 (explaining that the case was complex because employees themselves were filing the complaint, an outside attorney was involved, and there were workplace violence concerns). Hurlburt testified that witness outlines were "standard protocol" and were used to help officers "think through" the case and prove the charges. *Id.* at 38.

BNSF also strategized about which investigation hearing—Gunderson's or Mace's—should be held first. ECF No. 48-39 (July 17-20, 2009 email chain discussing strategic reasons for postponing Mace's investigation until after Gunderson's). BNSF decided to hold Gunderson's hearing first. Sometime during the days leading up to that hearing, Babik was overheard by a shuttle-bus driver saying, "I don't give a shit what I have to do I'm not going to rest until I have that fucker[']s [i.e., Gunderson's] head on a platter and he's fired!" ECF No. 48-35 at 3.

The first hearing (related to Gunderson's alleged harassment of Duke) was held on August 12, 2009. *See* ECF No. 48-21. Duke repeated his allegations that Gunderson had approached him on multiple occasions. ECF No. 48-13 at 8-22. Duke testified that he felt harassed and threatened, *id.*, and that Gunderson's behavior caused him to have

panic attacks and depression, *id.* at 22. Duke further said that, as a result of Gunderson's harassment, he dreaded going to work. *Id.* Gunderson testified that it was Duke who had approached Gunderson about stopping the Peterson investigation. *Id.* at 6; *see also* ECF No. 52-1 at 32 (Gunderson's ALJ testimony that Duke wanted "to get out" of the Peterson investigation and told Gunderson that "this thing is all blown out of proportion"). Gunderson admitted that he had delivered the draft recantation letter, but said he did so merely as a favor to Peterson's attorney. ECF No. 48-13 at 3-5. Gunderson denied that he personally had asked Duke to recant his statement. *Id.*

The second hearing (related to Gunderson's alleged threat to Beam) was held the next day. *See* ECF No. 48-24. At this hearing, Beam, Poundstone, and Collins testified about Gunderson's statement. ECF No. 48-23 at 3-5 (Beam), 6-8 (Poundstone), 9-11 (Collins). Each said that he had heard the statement, and each said that he had interpreted the statement as a threat. *Id.* at 4 (Beam), 7 (Poundstone), 9 (Collins); ECF No. 48-1 at 59 (Beam), 67-68 (Poundstone). Gunderson testified that he did not remember making the statement. ECF No. 48-23 at 12, 13.[3]

After the hearings, Ebel reviewed the transcripts and the evidence. Ebel decided that each charge had been proven, and that Gunderson should be fired. ECF No. 48-1

---

[3]More than two years later, at an evidentiary hearing before an administrative law judge, Gunderson denied threatening Beam. ECF No. 54-1 at 3 ("I don't remember saying that, and I never threatened Mr. Herb Beam. Nineteen-and-a-half years, I'm not going to threaten anybody. I'm just not going to do it.").

at 107 (first charge), 87 (second charge). Regarding the first charge, Ebel decided to dismiss Gunderson for harassing Duke on multiple occasions. *See* ECF No. 48-22 at 3. Before dismissing Gunderson, Ebel sought advice from Percival, Hurlburt, Siegele, and Sam Sexhus (a regional vice president) about his decision. ECF No. 48-1 at 105-06. They agreed that dismissal was warranted. *Id.* Regarding the second charge, Ebel decided to dismiss Gunderson for threatening Beam. *Id.* at 87, 103-04. Before doing so, Ebel again consulted Hurlburt, Siegele, and Sexhus, and they again agreed that Gunderson should be dismissed. *Id.* at 110.

Mace, by contrast, was not dismissed (although he was disciplined). Mace had engaged in only a single, relatively friendly conversation with Cluka after a chance encounter in a grocery store. BNSF viewed this as considerably less "egreg[ious]" than Gunderson's repeated harassment of Duke. ECF Nos. 48-39 at 3 & 54-1 at 44-45, 50 (considering the allegations against Gunderson as "much more severe").

Gunderson was dismissed for violating three written BNSF policies. First, BNSF concluded that both the harassment of Duke and the threat made to Beam violated BNSF policy "GCOR 1.6." ECF Nos. 48-21 & 48-24. GCOR 1.6 states that "[a]ny act of hostility, misconduct, or willful disregard or negligence affecting the interest of the company or its employees is cause for dismissal and must be reported." ECF No. 54-2 at 4. Second, BNSF concluded that both the harassment of Duke and the threat made to Beam contravened its "Workplace Harassment Policy." ECF Nos. 48-21 & 48-24. The

"Workplace Harassment Policy" prohibits "verbal or physical conduct by any employee which harasses, disrupts, or interferes with another's work performance or which creates an intimidating, offensive, or hostile environment." ECF No. 48-13 at 28. Finally, BNSF concluded that the threat made to Beam violated its "Violence in the Workplace" policy, which prohibits "violent or threatening behavior," including "any behavior that by its very nature could be interpreted by a reasonable person as demonstrating intent to cause physical harm to another individual." *Id.* at 26; ECF No. 48-24. Listed among the policy's "potential violence indicators" is "[v]erbal, nonverbal, or written threats or intimidation, explicit or subtle." ECF No. 48-13 at 27. Gunderson was dismissed on August 25, 2009. ECF No. 48-21.

## G. Reviews of Gunderson's Dismissals

Gunderson unsuccessfully challenged his dismissals through BNSF's internal appeals process. In addition to providing the right to appeal, BNSF has adopted a "Policy for Employee Performance Accountability" ("PEPA"), which is "designed to promote consistency" in discipline across the company. ECF No. 48-1 at 70. The PEPA requires that all dismissals be reviewed by BNSF's director of employee performance. *Id.* at 70-71. Pursuant to the PEPA, Hurlburt (who was then director of employee performance) reviewed the transcripts from both of Gunderson's hearings and recommended dismissal in each case. *Id.* at 71, 87. The "PEPA Board" also reviews each dismissal, approximately 60 to 90 days after the termination of an employee. *Id.*

at 71-72.  The PEPA Board also agreed with the decisions to dismiss Gunderson.  *Id.*

at 89; ECF No. 52-1 at 86.[4]

Gunderson then sought review by the Public Law Board ("PLB")—a three-

person arbitration panel consisting of a neutral person, a company representative, and a

union representative.  ECF No. 48-1 at 75.  The PLB upheld both dismissals.[5]  *See* ECF

Nos. 48-30 & 48-31.  Next, Gunderson filed a complaint with OSHA alleging unlawful

retaliation.  OSHA rejected his complaint.  Gunderson then sought de novo review by

an administrative law judge ("ALJ").  After a six-day hearing, the ALJ dismissed

Gunderson's complaint.  ECF No. 48-41 (Jan. 10, 2014 ALJ decision and order).  Finally,

Gunderson invoked the "kick-out" provision of the FRSA, *see* 49 U.S.C. § 20109(d)(3),

and initiated these proceedings in federal court.[6]

---

[4]The case summary for the PEPA Board included in Gunderson's work record that he had three reportable work injuries resulting in a total of 83 lost days of work. ECF No. 52-1 at 80.

[5]The PLB's factual findings are not preclusive.  The investigation and PLB review procedures in this case mirror those in *Grimes v. BNSF Railway Co.*, in which the Fifth Circuit held that collateral estoppel did not apply.  746 F.3d 184, 190 (5th Cir. 2014) ("[B]ecause it was the railroad that conducted the investigation and hearing and terminated Grimes, and because the PLB only reviewed a closed record, the procedures were not adequate for collateral estoppel to apply.").

[6]It may seem wasteful that an employee such as Gunderson can try his case before an ALJ, lose, and then try his case all over again in federal court, but that is what the FRSA permits.  As this Court explained in an earlier order in this case:

(continued...)

## II. STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

## III. ANALYSIS

The FRSA prohibits BNSF from retaliating against employees who engage in protected activity, which includes reporting hazardous safety conditions and reporting personal injuries. *See* 49 U.S.C. § 20109(a)-(b). To establish a prima facie case of retaliation, Gunderson must show: (1) that he engaged in protected activity; (2) that

---

[6](...continued)

> Under certain circumstances . . . employees have the right to abandon the administrative process and file an original action in federal district court. In particular, if the Secretary fails to issue a final decision within 210 days after the administrative complaint was filed, and if the delay was not due to bad faith on the employee's part, then the employee may bring an original action for de novo review in federal district court. 49 U.S.C. § 20109(d)(3).

*Gunderson v. BNSF Ry. Co.*, 29 F. Supp. 3d 1259, 1259 (D. Minn. 2014).

BNSF knew that he had engaged in protected activity; (3) that he suffered an adverse employment action; and (4) that "the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014). Even if Gunderson establishes a prima facie case, BNSF can avoid liability if it "demonstrates, by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence of [Gunderson's] protected activity." *Id.* (quoting 49 U.S.C. § 42121(b)(2)(B)(ii)) (internal brackets omitted).

## A. Prima Facie Case

There is no dispute that Gunderson has satisfied the first three elements of a prima facie case. Gunderson engaged in protected activity when he raised numerous safety concerns over a span of eight or nine years and when he reported a personal injury in September 2008. *See* 49 U.S.C. § 20109(a)-(b). BNSF knew about Gunderson's protected activity. And Gunderson suffered an adverse employment action when he was fired. *See id.* The dispute is over the fourth element— whether Gunderson's protected activity was a contributing factor in the decision to dismiss him.

A contributing factor is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Kuduk*, 768 F.3d at 791 (quoting Procedures for the Handling of Retaliation Complaints under the Federal Railroad Safety Act, 75 Fed. Reg. at 53,524). The contributing-factor standard is more

lenient than the causation standard applied in other employment-retaliation contexts, and it "does not require that the employee conclusively demonstrate the employer's retaliatory motive." *Kuduk*, 768 F.3d at 791 (quoting *Coppinger-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010)). Nevertheless, to prove a prima facie case of retaliation, the employee must prove by a preponderance of the evidence that "intentional retaliation prompted by the employee engaging in protected activity" was a contributing factor to the decision to dismiss the employee. *Id.* at 791. In other words, although it need not be the determinative factor, an unlawful retaliatory motive—or "discriminatory animus"—must have contributed in some way to the decision. *Id.* at 791, 791 n.4.

Discriminatory animus is often shown by circumstantial evidence. Circumstantial evidence may include evidence of "a temporal proximity, pretext, shifting explanations by the employer, antagonism or hostility toward the plaintiff's protected activity, the falsity of the employer's explanation or a change in the employer's attitude toward plaintiff after he/she engaged in protected activity." *Kuduk v. BNSF Ry. Co.*, 980 F. Supp. 2d 1092, 1101 (D. Minn. 2013) (citing *DeFrancesco v. Union R.R. Co.*, ARB No. 10-114, ALJ No. 2009-FRS-0 (ARB Feb. 29, 2012)), *aff'd*, 768 F.3d 786 (8th Cir. 2014). Gunderson has offered no evidence of temporal proximity, shifting explanations by BNSF, or a change in BNSF's attitude toward Gunderson after he engaged in protected activity. Instead, Gunderson argues that he has offered sufficient evidence of antagonism and pretext.

1. Antagonism or Hostility Toward Protected Activity

Gunderson has submitted ample evidence that two employees of BNSF—Beam and Babik—were angry about Gunderson's protected activity. But to make out a claim of unlawful retaliation, Gunderson must submit evidence of a connection between this hostility and the decision to terminate him. *See Carraher v. Target Corp.*, 503 F.3d 714, 718-19 (8th Cir. 2007) (requiring plaintiff to establish a "causal connection" between age-based statements and plaintiff's termination). The Eighth Circuit "carefully distinguishe[s] between comments which demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions, from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." *Mohr v. Dustrol, Inc.*, 306 F.3d 636, 640-41 (8th Cir. 2002) (internal quotation marks omitted), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

Here, the record is clear that the decisions to investigate and then terminate Gunderson were made by Ebel, not by Beam or Babik. Thus, Gunderson must show that when *Ebel* decided to fire him, *Ebel* was motivated at least in part by hostility toward Gunderson's protected activity. Gunderson's claim fails because there is no evidence that Ebel was motivated by hostility toward Gunderson's safety complaints or report of injury. To the contrary, the evidence in the record strongly supports BNSF's

contention that Ebel fired Gunderson for two independent reasons: (1) because Gunderson harassed Duke, and (2) because Gunderson threatened Beam.

Gunderson has made three arguments to the contrary:

First, at the hearing on BNSF's summary-judgment motion, Gunderson argued that Ebel's hostility can be inferred from the fact that Gunderson's safety complaints negatively affected productivity, and anything that negatively affects productivity negatively affects managers (such as Ebel). This inference is too tenuous and speculative to support a finding that Ebel was motivated by hostility toward Gunderson's safety complaints. Indeed, on Gunderson's reasoning, summary judgment could never be granted in a retaliation case brought by a safety advocate who was fired by a manager.

Second, Gunderson also argued at the hearing that Ebel was hostile to his 2008 injury report because Ebel's bonus was affected by the total number of injuries reported. As noted, there is a dispute over whether Ebel's bonus was affected by injury reports in his territory (as Gunderson alleges) or by injury reports nationwide (as BNSF alleges). But even assuming that Gunderson is correct, this inference is too tenuous and speculative to support a finding that Ebel was motivated by hostility toward Gunderson's injury report. Gunderson reported a single injury that occurred almost a year before Ebel decided to dismiss him. There is no evidence that this single report had more than a minuscule impact on Ebel's bonus.

Finally, Gunderson spends a great deal of time emphasizing evidence that *Beam* and *Babik* were hostile to his protected activity. *See, e.g.*, ECF Nos. 48-1 at 8 (Beam complained that Gunderson "threw [a] whole fucking wrench into my yard" after one of Gunderson's safety complaints); 48-35 at 3 (Babik said, "I don't give a shit what I have to do I'm not going to rest until I have that fucker[']s [i.e., Gunderson's] head on a platter and he's fired!"); & 52-1 at 65-66 (Beam "was upset about [Gunderson's] repeated complaints about safety and other matters," and Babik "was mad about the injuries that Gunderson reported"). As the Court has already explained, however, evidence of Beam and Babik's hostility does not support a claim of retaliation unless Beam and Babik influenced Ebel's decisions to dismiss Gunderson. *See Mohr*, 306 F.3d at 640-41; *see also Gibson v. Geithner*, 776 F.3d 536, 541 (8th Cir. 2015) (stating that for "cat's paw" liability, plaintiff must put forward evidence that non-decisionmaker influenced decisionmaker).

Gunderson has not cited evidence that Beam or Babik influenced either of Ebel's decisions. It is important to bear in mind that Gunderson was dismissed for two separate reasons, either of which, standing alone, would have resulted in his dismissal: (1) because he harassed Duke and (2) because he threatened Beam. As to the dismissal for harassing Duke, Beam was not involved at all, and Babik's only involvement was passing along Campen's report to Ebel. As to the dismissal for threatening Beam, Babik was not involved at all, and Beam's only involvement was as the *victim*. Thus, Beam

reported the threat to Ebel—as he was required to do under company policy, and as he was encouraged to do by Poundstone (who had no knowledge of Gunderson's protected activity)—and Beam later testified as a witness at the second hearing. But Beam otherwise had no involvement.

The only evidence that in any way connects Beam or Babik to Ebel's two decisions is a series of emails among BNSF officers in the weeks leading up to the investigations. These emails discussed logistics and strategy relating to the Gunderson and Mace investigations. *See* ECF Nos. 48-38 (June 1-3, 2009 email chain discussing the wording of the first notice of investigation, withholding Mace from service, and the deadlines for serving notice and holding the hearing); 54-4 (June 3, 2009 email chain discussing further changes to the language in the first notice of investigation); & 48-39 (July 17-20, 2009 email chain discussing strategic reasons for postponing Mace's investigation until after Gunderson's).

Beam and Babik were *copied* on these emails—as was appropriate, given that they were the BNSF officers on site at the Willmar terminal—but their direct participation in the emails was trivial. For example, on June 1, 2009, Beam emailed Ebel to "request a call to discuss the statements provided and the attached proposed inv[estigation] notice with LR etc." and to ask if there was "anything else [he could] do to facilitate this." ECF No. 48-38 at 6. Beam also emailed several officers that day to relay Ebel's availability for a meeting. *Id.* at 2. Beam was only copied on the other emails from June 1. *See id.*

Babik was only copied on all of the June 1 emails; he did not send or respond to any of those emails. *See id.*

On June 3, 2009, Beam emailed Babik and other BNSF officers noting one change to the language in the first investigation notice. ECF No. 54-4 at 2. Babik did not respond, and Beam was only copied on the other emails from that day. *See id.*

On July 18, 19, and 20, 2009, Babik sent several emails to various BNSF officers about scheduling Gunderson's and Mace's investigation hearings. *See, e.g.,* ECF No. 48-39 at 2 (asking other officers to "please forward . . . the actual request of postponement to put in file"), 3 ("Order [of investigation hearings] is the same as we discussed before, correct?"), 4 ("Mace investigation will go next week account not agreeable to postpone . . . ."). Beam did not respond to these emails. *See id.*

In short, nothing in these emails—and nothing about the fact that Beam and Babik were included in these email strings—suggests that they pressured Ebel or influenced his decisions. And thus, nothing in these emails suggests that either of Ebel's two decisions to fire Gunderson was motivated by hostility to his safety complaints or his report of a work-related injury.

### 2. Indications of Pretext

Gunderson also argues that his dismissals were pretext for unlawful retaliation. The "critical inquiry" for pretext "is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 997 (8th Cir. 2011) (quoting *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861-62 (8th Cir. 2009)). Gunderson must not only show that BNSF's reason for the adverse employment action was pretextual— that is, "false in some way"—but also that the real reason (or, more accurately, *a* real reason) for the employment action was unlawful retaliation. *Gibson*, 776 F.3d at 540 (quoting *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1017 (8th Cir. 2005)). The Court has already held that Gunderson does not have sufficient evidence to establish that Ebel was motivated by hostility toward Gunderson's protected activity. For the sake of completeness, however, the Court will address Gunderson's arguments about pretext.

First, Gunderson argues that he did not harass Duke and that he did not threaten Beam—and that, even if he did threaten Beam, it did not violate BNSF's policy against violence in the workplace because it was not a threat of immediate physical harm. But these arguments merely challenge the *correctness* of Ebel's conclusion that Gunderson engaged in misconduct. Gunderson "must demonstrate more than a genuine issue of material fact as to whether the employee violated workplace rules. He must show a

26

genuine issue of fact about whether the employer acted based on an intent to retaliate rather than on a good faith belief that the employee violated a workplace rule." *Richey v. City of Independence*, 540 F.3d 779, 784 (8th Cir. 2008).

On this record, a reasonable jury would have to find that Ebel's decisions to fire Gunderson were based on a good faith (even if mistaken) belief that Gunderson had harassed Duke and threatened Beam. Indeed, the evidence supporting Ebel's decisions is far more robust than the evidence that defendants typically point to in retaliation cases.

Here, Ebel based his decisions on evidence introduced and testimony given in two formal investigatory hearings—hearings at which Gunderson enjoyed an array of rights, including the right to be represented by his union, the right to introduce evidence, the right to testify, and the right to cross-examine the witnesses against him. Ebel's finding that Gunderson had harassed Duke was primarily based on the testimony of Duke himself—a fellow employee of Gunderson and, like Gunderson, a member of the union. Ebel's finding that Gunderson had threatened Beam was based not only on the testimony of Beam, but on the testimony of the two resource-protection officers (Poundstone and Collins). Both officers corroborated Beam's testimony in every material respect, and, as far as the record reflects, neither officer had any awareness of Gunderson's protected activity. Finally, BNSF's "Violence in the Workplace" policy prohibits "any behavior that by its very nature could be interpreted

by a reasonable person as demonstrating intent to cause physical harm to another individual"; thus, the policy on its face refutes Gunderson's argument that it is limited to threats of immediate physical harm. ECF No. 48-13 at 26.

Second, Gunderson argues that, after BNSF was told that he had harassed Duke, BNSF plotted to manufacture *additional* reasons to dismiss him by personally serving him with the notice of investigation, rather than mailing it. The idea, apparently, is that after Gunderson was alleged to have committed one violation, BNSF wanted to provoke him into committing another, so it decided to serve him in person in the hope that he would lose his temper and threaten Beam. This, however, is the stuff of conspiracy theories; it is not the type of evidence that defeats a summary-judgment motion. Putting aside the fact that Ebel, Beam, and the (disinterested) Poundstone all testified that notices of investigation had been personally served on other employees in the past, uncontradicted evidence establishes that Gunderson's notice was not finalized until less than 45 minutes before Gunderson was scheduled to arrive at work. Moreover, even if Gunderson's conspiracy theory was true, it does not mean that he did not threaten Beam; it just means that BNSF gave him the opportunity to threaten Beam. Gunderson still violated company policy, and Ebel still had the right to fire him for that violation. And, importantly, Gunderson's conspiracy theory is essentially irrelevant to Ebel's separate decision to fire him for harassing Duke.

Third, Gunderson points to Hurlburt's witness outline and argues that BNSF coached its witnesses because it wanted to see Gunderson terminated. The short answer to this allegation is "so what?" It is undisputed that the formal investigation is an adversarial process. Undoubtedly, the BNSF officer who acted as the "prosecutor" talked to his witnesses and hoped that the proceeding would result in Gunderson's termination, just as the union representative who acted as the "defense attorney" undoubtedly talked to his witnesses and hoped that the proceeding would not result in Gunderson's termination. None of this suggests that Ebel was motivated by hostility to Gunderson's protected activity, particularly given that Hurlburt was not even aware of that activity.

Finally, Gunderson argues that he can show pretext because he was disciplined more severely than Mace. "A plaintiff may show pretext, among other ways, by showing that an employer . . . treated similarly-situated employees in a disparate manner . . . ." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010). However, "[a]t the pretext stage, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012) (internal quotation marks omitted). The plaintiff and the comparator employee(s) must be "similarly situated in all relevant respects," including having "engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* (citations omitted). Importantly, "to be probative evidence of pretext, the misconduct of more

leniently disciplined employees must be of comparable seriousness." *Id.* (internal brackets omitted) (citation omitted).

Here, Gunderson and Mace were not similarly situated. Obviously, they were not similarly situated with respect to the threat made to Beam, as Mace had nothing to do with that threat and was not accused of threatening anyone else. They also were not similarly situated with respect to the harassment of Duke, as Gunderson's misconduct with respect to Duke was far more serious than Mace's misconduct with respect to Cluka. Mace was disciplined for asking Cluka to recant during a single, cordial, chance encounter at a grocery store. Gunderson, by contrast, was discharged for harassing Duke on multiple occasions.[7] Because Mace's conduct was not nearly as serious as Gunderson's, Mace is not similarly situated to Gunderson, and the fact that Mace was not fired is not evidence of pretext.

In sum, Gunderson has failed to establish a prima facie case of unlawful retaliation. In particular, he has not presented evidence sufficient to support a finding that his protected activity was a contributing factor to either of Ebel's two decisions to dismiss him. For this reason alone, BNSF is entitled to summary judgment.

_____

[7]BNSF also argues that the difference in seriousness between Gunderson's and Mace's conduct explains why Percival wrote in an email: "Mace may want to turn state's evidence for a Level 'S' 30 day Record and implicate Gunderson. We above all want Gunderson." *See* ECF No. 48-1 at 97-98. Gunderson has not offered evidence that Percival's comment was somehow related to Gunderson's protected activity.

## B. Clear and Convincing Evidence

Even if Gunderson had shown that hostility toward his protected activity contributed in some way to either or both of the decisions to fire him, the Court would nevertheless grant summary judgment to BNSF because it has demonstrated by clear and convincing evidence that it would have dismissed Gunderson even if he had not engaged in protected activity. *See Kuduk*, 768 F.3d at 789.

Evidence of whether BNSF would have dismissed Gunderson in the absence of his protected activity may include "temporal proximity between the non-protected conduct and the adverse actions," *Speegle v. Stone & Webster Constr., Inc.*, ARB No. 13-074, ALJ No. 2005-ERA-006, at *7 (ARB Apr. 25, 2014) (2014 WL 1758321); the thoroughness of BNSF's investigation, *see Kuduk*, 768 F.3d at 792; "statements contained in relevant office policies," *Speegle*, ARB No. 13-074 at *7; "the independent significance . . . of the non-protected activity," *id.*; and whether the dismissal was "approved by others in senior management," *see Kuduk*, 768 F.3d at 792.

Here, BNSF immediately and thoroughly investigated each alleged violation. It held two formal evidentiary hearings—one with respect to each charge—and at each hearing Gunderson was represented by the union and was able to present testimony, exhibits, and argument, and to cross-examine the witnesses presented by BNSF. At the first hearing, BNSF heard Duke—Gunderson's fellow employee and union member—testify that Gunderson had harassed and threatened him on multiple occasions, and

that, as a result, Duke was having panic attacks and depression and dreaded going to work.  At the second hearing, BNSF heard Beam and two disinterested resource-protection officers testify that Gunderson had threatened Beam.

BNSF has clear written policies against harassment and violence in the workplace.  In addition, BNSF's GCOR 1.6 policy warns that "[a]ny act of hostility, misconduct, or willful disregard or negligence affecting the interest of the company or its employees is cause for dismissal . . . ."  ECF No. 54-2 at 4.  Gunderson's conduct plainly violated these policies, and Ebel reasonably considered each of Gunderson's violations to be "serious."  ECF No. 48-1 at 92, 104.

Before Ebel made either decision to fire Gunderson, he reviewed the evidence that had been introduced at the hearings and transcripts of the testimony that had been given at those hearings.  In deciding whether to fire Gunderson for harassing Duke, Ebel sought advice from two labor-relations specialists (Hurlburt and Siegele), the director of administration (Percival), and the regional vice president (Sexhus).  Everyone to whom he spoke advised him to dismiss Gunderson.  In deciding whether to fire Gunderson for threatening Beam, Ebel again sought the advice of Hurlburt, Siegele, and Sexhus, and all advised him to fire Gunderson.

Ebel's decisions were supported both by Hurlburt (the director of employee performance at the time) and by the PEPA board.  After that, the PLB—a three-person arbitration panel consisting of a neutral person, a company representative, and a union

representative—upheld both dismissals. After that, OSHA rejected Gunderson's complaint that BNSF had engaged in unlawful retaliation. After that, an ALJ found no merit to Gunderson's complaint of retaliation after hearing six days of testimony and argument.

The evidence in the record is clear and convincing that, even if Ebel was motivated in part by hostility to Gunderson's protected activity, Ebel would have fired Gunderson in the absence of that hostility. For this reason too, BNSF is entitled to summary judgment.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.  Defendant's motion for summary judgment [ECF No. 45] is GRANTED.

2.  Plaintiff's complaint [ECF No. 1] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: July 28, 2015                          s/Patrick J. Schiltz_____
                                              Patrick J. Schiltz
                                              United States District Judge